**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

VARSITY BRANDS, INC., et al.,

    Plaintiffs/Counter-Defendants,

v.                                                                                                  Case No.  10-2508

STAR ATHLETICA, LLC,

    Defendant/Counter-Claimant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT, AND DISMISSING PLAINTIFF'S
STATE-LAW CLAIMS WITHOUT PREJUDICE**

    Classical philosophy does not often come to play in the field of mundane legal analysis.  But today it does, because central to the question the court must resolve in this copyright infringement case is to think about, and come close to defining, the essence of a "cheerleading uniform."  The philosopher Plato famously discussed the essence of a physical objects as separate from their ideal.  Taking the example of a tree, we may well consider as a "tree" a thing with only a few branches and fewer leaves, because it still reflects, however poorly, the ideal we inherently know to be "tree."  It possesses tree-ness.  *See, e.g.*, Plato, *The Republic* 207, 253–58, 361–66 (Benjamin Jowett trans., Vintage Books 1991).

    Here, the court's focus eventually turns to the "cheerleading-uniform-ness" of a fabric garment without any of the physical designs and colors ordinarily printed upon or otherwise imparted to a garment that identifies it, generally, as an unavoidably imperfect

reflection of the ideal of a "cheerleading uniform." In this case, because the court finds that the *absence* of such designs and colors simply fails to call to mind, or otherwise signal the presence of a cheerleading uniform in the garment at hand, it must also conclude that the *presence* of such designs and colors is at the core of the ideal—of "cheerleading-uniform-ness." With that conclusion, it also follows that the colors-and-designs component of a cheerleading uniform cannot be conceptually separated from the utilitarian object itself. Copyright protection, as a matter of law, cannot apply.

In 2010, Defendant Star Athletica, LLC ("Star"), a marketer and designer of various sports apparel, published a catalogue advertising its designs for cheerleading uniforms. Upon learning of Star's catalogue, Plaintiffs Varsity Brands, Inc., Varsity Spirit Fashions and Supplies, Inc., and Varsity Spirit Corporation (collectively, "Varsity"), sued alleging copyright infringement, trademark infringement, and a variety of state-law claims. After discovery, the parties cross-moved for summary judgment.

For the reasons summarized above and explained below, the court will grant in part and deny in part Star's motion for summary judgment, and deny Varsity's motion for summary judgment. Varsity's remaining state-law claims will be dismissed without prejudice.

## I. BACKGROUND

The following facts are undisputed. Varsity designs, manufactures, and sells apparel and accessories for use in cheerleading. (Pg. ID # 2228.) Star markets and sells various sports apparel, including cheerleading goods and uniforms. (Pg. ID # 2229.)

Varsity employs designers to create two-dimensional designs, some of which are incorporated onto the surface of cheerleading uniforms. (Pg. ID ## 2809, 2836.) It primarily uses two different methods for incorporating a design into a uniform: cutting and sewing and sublimation. (Pg. ID # 2810.) Cutting and sewing appears to be the more common method of incorporation, and it involves arranging panels of fabric and striped braid and sewing them together to resemble the intended design. (Pg. ID # 2810–11.) Sublimation involves printing the design on a piece of paper. The paper is then fed through a machine that heats the ink on the paper into a gas which is infused into the fabric by pressing the paper and fabric together.[1] (Pg. ID # 2811.)

Varsity's design team begins by sketching a design for a cheerleading uniform on paper. (*See* Pg. ID # 2837.) These designs are sketched over a model of a cheerleader, with the designer placing lines, curves, stripes, angles, diagonals, etc, in various colors and combinations over the sketched model. (*See, e.g.*, Pg. ID # 2842–45.) At the time a design is created, it is unknown whether it will actually be implemented on a cheerleading uniform. (Pg. ID # 2838.) While creating a uniform design, Varsity's designers are not given instructions, limitations, or guidelines from Varsity's production department. (*Id.*) If a finished garment does not look like the design it came from, the production department is instructed to try again. (Pg. ID # 2810, 2838.) In other words, the designers are not instructed to adapt their designs to the realities of production. (*Id.*)

---

[1] The parties disagree regarding whether sublimation was actually used by Varsity for the fabric designs at issue in this litigation. This disagreement is not material to the court's opinion.

Varsity registered five cheerleading uniform designs with the Copyright Office for the following Varsity design numbers: 074, 078, 0815, 299A, and 299B. (Pg. ID # 2230–31.) For three of these designs (074, 078, and 0815), Varsity submitted a sketch of the uniform as deposit material and the nature of the work and authorship is listed as "2-dimensional artwork." For the remaining two uniforms (299A and 299B), Varsity submitted a photograph of a completed uniform incorporating the design as deposit material, the nature of the work is listed as "fabric design (artwork)" and the nature of authorship is listed as "2-dimensional artwork." (Pg. ID # 2231–36.) Varsity claims that Star copied, reproduced, displayed, and distributed infringing images of these designs in its 2010 catalog and internet website, and that it infringed on Varsity's copyrights by incorporating the designs onto the surface of Star's cheerleading uniforms. (Pg. ID # 2310.) Varsity claims that pictures of cheerleading models wearing a selection of different styles of cheerleading uniform infringed its copyrights. (Pg. ID ## 3–4, 20, 24, 28, 32, 36.)

## II.  DISCUSSION

### A.  Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### B. Copyright Infringement (Counts I–V)

In order to establish copyright infringement, two elements must be proven: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Determining whether an item is subject to copyright protection is question of law for the court to decide. *See Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*, 134 F. App'x 1, 4 (6th Cir. 2005). Copyright protection extends to "pictorial, graphic, and sculptural works" ("PGS works"), which are defined as "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, . . . diagrams, models, and technical drawings." 17 U.S.C. §§ 101, 102(a)(5). Copyright protection for PGS works includes:

> works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a [PGS] work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features

> that *can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article*.

17 U.S.C. § 101. "A 'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." *Id.*

Clothing possesses both utilitarian and aesthetic value.[2] *See, for example*, *Jovani Fashion, Ltd. v. Fiesta Fashions*, 500 F. App'x 42, 44 (2d Cir. 2012); *Galiano v. Harrah's Operating Co.*, Inc., 416 F.3d 411, 417 (5th Cir. 2005). To the extent that clothing design sets forth the shape, style, cut, and dimensions for converting fabric into a finished garment, the design is not copyrightable. M. Nimmer and D. Nimmer, 1 *Nimmer on Copyright* § 2.08[H][1]–[3], at 2-143–149 (2013). However, to the extent that a design sets forth a pattern that will be "imprinted on a fabric, such as a rose petal" the design may be copyrightable if it "can be identified separately from, and [is] capable of existing independently of, the utilitarian aspects of the article." *Id.*; 17 U.S.C. § 101. "[W]hile 'useful articles,' taken *as a whole*, are not eligible for copyright protection, the individual design elements comprising these items may, viewed *separately*, meet the Copyright Act's requirements." *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 328 (2d Cir. 2005) (emphasis in original). The question whether a design is

---

[2]Varsity argues that it is entitled to a presumption that its copyright is valid because it has introduced a certificate of registration made within five years of the first publication of three of the works at issue. *See* 17 U.S.C. § 410(c). However, courts have routinely noted that this presumption is "fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations." *See, e.g., Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 430 (4th Cir. 2010) (per curiam). Because, as discussed *infra*, other evidence in the record exists which suggests that the works at issue are non-copyrightable utilitarian articles, this presumption is easily dispensed with. *See Fonar Corp. v. Domenick*, 105 F.3d 99, 105 (2d Cir. 1997).

6

separable from the utilitarian aspects of an article has "presented courts with significant difficulty." *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 921 (7th Cir. 2004). As one leading commentator notes: "Of the many fine lines that run through the Copyright Act, none is more troublesome than the line between protectible [PGS] works and unprotectible utilitarian elements of useful articles." Paul Goldstein, 1 *Goldstein on Copyright* § 2.5.3, at 2:67 (3d ed. 2013). In addition to providing a thoughtful and comprehensive assessment of the development of the law in this area, *Pivot Point* summarizes the variety of tests that courts have used in considering the issue:

> 1) the artistic features are "primary" and the utilitarian features "subsidiary," *Kieselstein–Cord* [*v. Accessories by Pearl, Inc.*], 632 F.2d [989,] 993 [2d Cir. 1980]; 2) the useful article "would still be marketable to some significant segment of the community simply because of its aesthetic qualities," Melville B. Nimmer & David Nimmer, 1 Nimmer on Copyright § 2.08[B][3], at 2–101 (2004); 3) the article "stimulate[s] in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function," *Carol Barnhart* [*Inc., v. Econ. Cover Corp.*], 773 F.2d [411,] 422 (Newman, J., dissenting); 4) the artistic design was not significantly influenced by functional considerations, *see Brandir Int'l*, [*Inc. v. Cascade Pac. Lumber Co.*], 834 F.2d at 1145 (adopting the test forwarded in [Robert C.] Denicola, [*Applied Art & Industrial Design: A Suggested Approach to Copyright in Useful Articles*, 67 Minn. L. Rev. 707, 741 (1983)]); 5) the artistic features "can stand alone as a work of art traditionally conceived, and . . . the useful article in which it is embodied would be equally useful without it," Goldstein, 1 [*Goldstein on*] *Copyright* § 2.5.3, at 2:67; and 6) the artistic features are not utilitarian, *see* William F. Patry, 1 *Copyright Law & Practice* 285 (1994).

*Pivot Point*, 372 F.3d at 923 (citations altered). Although it does not appear that the Sixth Circuit has addressed this issue, several recent out-of-circuit cases—including *Pivot Point*—are instructive.

In *Pivot Point*, the Seventh Circuit considered whether a mannequin head that imitated the "'hungry look' of high-fashion, runway models" could be copyrighted. *Id.* at 915. The mannequin head at issue was used as a model for hair stylists and cosmetic

7

stylists to practice their craft. After summarizing the jurisprudential history of the separability standard in the Second Circuit, the Seventh Circuit concluded that "[c]onceptual separability exists . . . when the artistic aspects of an article can be conceptualized as existing independently of their utilitarian function." *Id.* at 931. The court looked to "whether the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences." *Id.* (citation and quotation marks omitted). "If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists. Conversely, when the design of a useful article is as much the result of utilitarian pressures as aesthetic choices, the useful and aesthetic elements are not conceptually separable." *Id.* at 931 (citations and quotation marks omitted).

Applying what may be referred to as the "aesthetic influence test,"[3] the Seventh Circuit held that the style of the mannequin's face existed independently of its functional concerns, namely facilitating easy make-up application and hair styling. *Id.* at 931–32. Instead, the designer was simply told to create a model reflecting the "hungry-look" of high fashion, and was free to implement that concept as he wished without regard to specifications for how far the mannequin's eyes needed to be apart, or how high the eyebrows should be. *Id.* at 932. The court concluded that because the mannequin's creative aspects "were meant to be seen and admired," its sculptural features existed

---

[3] Judge Kanne criticized this test in his dissent, "All functional items have aesthetic qualities. If copyright provided protection for functional items simply because of their aesthetic qualities, Congress's policy choice that gives less protection in patent than copyright would be undermined." *Pivot Point*, 372 F.3d at 932 (Kanne, J., dissenting).

8

independently from its utilitarian features and it was therefore entitled to copyright protection. *Id.* at 932.

The Fifth Circuit declined to apply the Seventh Circuit's aesthetic influence test to garment design in *Galiano*. In *Galiano*, the plaintiff was the founder and owner of a clothing design company that produced uniforms for Harrah's casinos, who applied for and received copyright protection for her sketches of a costume collection. 416 F.3d at 413. After the expiration of a consulting agreement with Harrah's, she sued Harrah's for continuing to use and order the uniforms she had designed. *Id.* at 414. The court looked to the marketability test proposed in *Nimmer on Copyright*: "[C]onceptual severability exists where there is any substantial likelihood that even if the article had no utilitarian use it would still be marketable to some significant segment of the community simply because of its aesthetic qualities." *Galiano*, 416 F.3d at 419; *Nimmer*, § 2.08[B][3], at 2-99. The court adopted the marketability test for garment design only, and noted that the test has the benefits of being a "more determinate rule" that provides necessary clarity for the conceptual severability analysis.[4] *Galiano*, 416 F.3d at 421. Turning to the uniforms at issue in *Galiano*, the court concluded that the plaintiff had

---

[4]*Nimmer* notes that its "likelihood-of-marketability test has the virtue of harmonizing various holdings in this fractured field[,]" but that the standard "can be critiqued as (1) strange to copyright; (2) liable to unduly favor more conventional forms of art; and (3) . . . too restrictive." *Nimmer*, § 2.08[B][3], at 2-99–100. The Fifth Circuit acknowledged, but discounted, these critiques because "[as to (1)] all lawmaking with respect to PGS works is interstititial, and most of it [is] freewheeling . . . (2) is a salient concern only if we apply the marketability test across the spectrum of applied artwork[,] . . . [and] (3) . . . theoretical unfairness is outweighed by the interest in having a determinate rule." *Galiano*, 416 F.3d at 421 n.26.

made no showing that its designs were marketable independent of their utilitarian function as casino uniforms. *Id.*

The Fourth Circuit recently applied *Pivot Point* in *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417 (4th Cir. 2010) (per curiam), a case involving competing furniture companies. *Id.* at 424. Universal Furniture produced two collections of furniture that incorporated decorative carvings on the furniture; Collezione imitated these designs and produced similar furniture at lower cost. *Id.* The Fourth Circuit held that the decorative elements (as opposed to the shape) of Universal Furniture's designs could receive copyright protection. The court reasoned that the furniture compilations were "superfluous nonfunctional adornments for which the shape of the furniture (which is not copyrightable) serves as the vehicle. . . . the designs are 'wholly unnecessary' to the furniture's utilitarian function." *Id.* at 434. Turning to the *Pivot Point* aesthetic influence test, the court recognized that Universal Furniture's designer "was influenced by function in designing [the] decorative elements. After all, . . . 'furniture has got to function.'" *Id.* Nevertheless, the court held that the designer's artistic judgment was sufficiently independent because "his objective in compiling these decorative elements onto the basic shapes of the furniture was not to improve the furniture's utility but to 'give [the pieces] a pretty face.'" *Id.* The court further noted that the conceptual separability test provided in § 101 is conjunctive, but that as applied to decorations on furniture, the test presented a "metaphysical quandary" namely that "[t]he elements serve no purpose divorced from the furniture—they become designs in space." *Id.* However, because the designs were original and conceptually severable

from utilitarian aspects of the furniture, the court concluded that the decorative features were entitled to copyright protection.

Two cases from the Second Circuit also bear mentioning. In *Chosun*, the court considered whether elements of a plush sculpted animal costume could be seperable from the overall design of the costume and thus eligible for protection under the Copyright Act. 413 F.3d at 329. The court vacated the district court's dismissal of the plaintiff's copyright claims, noting that "when a component of a useful article can actually be removed from the original item and separately sold, without adversely impacting the article's functionality, that physically separable design element may be copyrighted." *Id.* (emphasis added). This supports *Galiano*'s marketability test by incorporating a consideration of whether a design element could be separately marketed into the issue of conceptual severability.

The Second Circuit directly addressed garment design in *Jovani*, where the plaintiff appealed the dismissal of its copyright claim alleging that the defendant infringed a registered copyright for the design of a prom dress. 500 F. App'x at 43. The plaintiff argued that the "arrangement of decorative sequins and crystals on the dress bodice; horizontal satin ruching at the dress waist; and layers of tulle on the skirt" qualified as conceptually separable dress elements worthy of copyright protection. The court held that physical separability was impossible, as the "removal of these items would certainly adversely affect the garment's ability to function as a prom dress, a garment specifically meant to cover the body in an attractive way for a special occasion." *Id.* at 44. Similarly, the court held that conceptual severability was also impossible: "the artistic judgment exercised in applying sequins and crystals to the

dress's bodice and in using ruched satin at the waist and layers of tulle in the skirt does not invoke in the viewer a concept other than that of clothing." *Id.* at 45.  Instead, the decorative elements on the dress were used to enhance the functionality of the dress for a special occasion, merging the aesthetic with the functional in an attractive way for that special occasion. *Id.*  Although the prom dresses at issue undoubtedly had artistic elements:

> the decorative choices . . . merge with those that decide how (and how much) to cover the body.  Thus, a jeweled bodice covers the upper torso at the same time that it draws attention to it; a ruched waist covers the wearer's midsection while giving it definition; and a short tulle skirt conceals the wearer's legs while giving glimpses of them.

*Id.*  The court concluded that because it was impossible to separate the aesthetic design from the functional effect of that design, copyright protection could not extend to cover plaintiff's dresses.

It is obvious that there is considerable disagreement regarding the proper standard to apply when considering whether elements of protectable PGS works are separable from their utilitarian function.

First, it is necessary to identify just what Varsity has copyrighted, and how Star is claimed to have violated these copyrights.  Varsity copyrighted 2-dimensional artwork in five cheerleading uniform designs.  (Pg. ID # 2230–36).  For three of these designs, the deposit material constitued sketches of a cheerleader wearing a cheerleading uniform with the design at issue.  For the remaining two designs, Varsity submitted a photograph of a completed uniform as the deposit material.  Varsity claims that Star infringed its copyright in these designs by producing cheerleading uniforms that incorporated these designs, photographing models wearing these uniforms, and

12

publishing photographs of the uniforms in its 2010 catalogue. As Varsity puts it, "Star has infringed all five of the Designs at Issue, by copying, reproducing, displaying and/or distributing its infringing images in its catalog and on its internet website, and by incorporating the designs onto the surface of its garments." (Pg. ID # 2301.)

The court begins its analysis with the words of the statute: "the design of a useful article, as defined in this section, shall be considered a [PGS] work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that *can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article*." 17 U.S.C. § 101 (emphasis added). The first clause "sculptural features that can be identified separately from [the utilitarian aspects of the article]" implies conceptual severability, that is, whether the court can conceive of the allegedly copyrightable features as separate from the utilitarian article. The second clause that asks "are [the features] capable of existing independently of[] the utilitarian aspects of the article" implies physical separability; can the design exist independently of the utilitarian article? Although courts and commentators have recognized that there is substantial overlap between these two questions, each appears to be a separate inquiry under the statute.

Turning first to conceptual severability, Varsity argues that because its designers sketch the uniform designs independent of functional influences, its designs are conceptually separable from the utilitarian features of the cheerleading uniforms, and are therefore protected under the Seventh Circuit's aesthetic influence test. *See Pivot Point*, 372 F.3d at 931. Varsity points to statements from its Vice Presidents of Design and Production that the production team is forced to adapt their production of uniforms

to the design given to them, and that designers are never asked to adapt their designs to the practical realities of production. Varsity argues that this lack of functional influence should predominate the conceptual separability test, and that the outer edge of the garment merely operates as the edge of a canvas, with unlimited possibilities therein.

However, this analysis does not meaningfully engage with the issue in this case. That is, can a cheerleading uniform be conceived without any ornamentation or design, yet retain its utilitarian function as a cheerleading uniform? The Second Circuit's decision in *Jovani* is instructive on this point. As in *Jovani*, the combination of braids, chevrons, and stripes on the sketches does not invoke any concept other than that of clothing. Indeed, the sketches are clearly of clothing, in that they depict cheerleading uniforms on young women who appear to be cheerleaders. (*See, e.g.*, Pg. ID # 2842–45.) Similar to the prom dresses at issue in *Jovani*, a cheerleading uniform is "a garment specifically meant to cover the body in an attractive way for a special occasion." *Jovani*, 500 F. App'x at 44. The artistic judgment that is exercised in applying stripes, patterns, and chevrons, "does not invoke in the viewer a concept other than that of clothing." *Id.* at 45. Indeed, it is not at all clear from the sketches at issue in this case that the concept was any different in the designer's mind. The design sketches are clearly of cheerleading uniforms, conceived as worn by cheerleaders. Although it may be true that the production department did not instruct the designers not to include a certain chevron or stripe combination because the realities of fabric production would not allow it, it also appears to be true that the designers were at all times conceiving of and sketching various designs of cheerleading uniforms.

Put another way, a cheerleading uniform loses its utilitarian function as a cheerleading uniform when it lacks all design and is merely a blank canvas. An examination of the blank cheerleading silhouettes that Varsity submitted illustrates this point. (*See* Pg. ID # 2825–26.) Without the kind of ornamentation familiar to sports (or cheerleading) fans, the silhouette no longer evokes the utilitarian concept of a cheerleading uniform, a garment that is worn by a certain group of people in a specific context. (*See, for example*, Pg. ID # 2814–18.) Varsity argues that a blank cheerleading silhouette "covers the body to the same degree, wicks away moisture, and withstands the rigors of cheerleading movements at least as much as, if not more than, a garment that has a design on the front of it." (Pg. ID # 2342.) This statement may be true, but it ignores the fact that the utilitarian function of a cheerleading uniform is not merely to clothe the body; it is to clothe the body in a way that evokes the concept of cheerleading. Artistic judgment and design are undeniably important in this context, but they are not separable from the utilitarian function of the resulting garment.

For this reason, *Universal Furniture* is distinguishable. The designs at issue in *Universal Furniture* were carvings on pieces of furniture. As the Fourth Circuit noted, the designs were "wholly unnecessary" to the furniture's utilitarian function. *Universal Furniture*, 618 F.3d at 434. A desk without carved designs on it, although perhaps less aesthetically pleasing, is still a desk. As such, it still serves its utilitarian function and is separate conceptually from the carved designs themselves. In contrast, a blank silhouette of a purported "cheerleading uniform" without team colors, stripes, chevrons, and similar designs typically associated with sports in general, and cheerleading in particular, is not recognizable as a cheerleading uniform. It evokes an entirely different

15

concept in the viewer's mind. This is because, as a matter of law, the design of cheerleading uniforms has merged with the utilitarian function they serve. And under the Fifth Circuit's marketability test in *Galiano*, it is unlikely that the designs in this case would be marketable outside of their utilitarian function as cheerleading uniforms. *Galiano*, 416 F.3d at 419–21.

Attempting to physically separate the cheerleading designs further underscores this concept. In addition to posing the type of "metaphysical quandary" of free floating "designs in space" identified in *Universal Furniture*, removing the lines, patterns, and chevrons from the actual physical garments at issue in this litigation and placing them on a different canvas does not remove their association as cheerleading uniforms. *See Universal Furniture*, 618 F.3d at 434. A sample fabric displaying sublimated designs illustrates this point. Despite showing the design physically separated from a utilitarian cheerleading uniform, the fabric evokes the image and concept of a cheerleading uniform and proves the difficulty of removing the design from the utilitarian article. (*Compare* Pg. ID # 2820–23, *with* Pg. ID # 2825–26.) In short, the concept remains the same, even if the medium changes.

Because the court concludes as a matter of law that it is not possible to either physically or conceptually sever Varsity's designs from the utilitarian function of the resulting cheerleading uniforms, the court grants Star's motion for summary judgment on each of Varsity's copyright infringement claims, counts I–V of the complaint. (Pg. ID # 6–10.) The court denies Varsity's motion for summary judgment as to the same.[5]

---

[5]Varsity also moved for summary judgment on Star's counterclaims of fraud on the Copyright Office and copyright misuse. However, despite being cast as

## C. Trademark Infringement (Count X)

Varsity originally brought a claim under the Lanham Act based on the naming conventions and style codes initially adopted and used in Star's 2010 catalog. Star moved for summary judgment on this claim and in its responsive motion, Varsity indicates that it does not oppose Star's motion for summary judgment. (Pg. ID # 2360.) Therefore, summary judgment is granted to Star on count X of Varsity's complaint.

## D. State Law Claims (Counts VI–IX, XI)

Star also moves for summary judgment on Varsity's state-law claims of unfair competition, inducing breach of contract, inducing breach of fiduciary duty, and civil conspiracy. As discussed above, the court grants summary judgment to Star on Varsity's copyright infringement claims, as well as on Varsity's trademark infringement claim, leaving only state-law claims pending before the court. "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996); 28 U.S.C. § 1367(c)(3). ("The district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). Because the state-law issues raised

---

"counterclaims" it appears that they are more accurately described as "affirmative defenses." *See, for example, Microsoft Corp v. Compusource Distributors, Inc.*, 115 F. Supp. 2d 800, 810 (E.D. Mich. 2000) (Borman, J.) (characterizing copyright misuse as a defense to copyright infringement); *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990) (same); *Tacori Enters. v. Rego Mfg.*, No. 1:05cv2241, 2008 WL 4426343, at *14 (N.D. Ohio Sept. 25, 2008) (characterizing fraud on the copyright office as an affirmative defense). Because the court grants summary judgment to Star on other grounds, it is not necessary to address the merit of these affirmative defenses.

in the remaining claims are better addressed in state court, the court dismisses counts VI–IX, and XI without prejudice.

### III. CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' motion for summary judgment [Dkt. # 169] is GRANTED IN PART and DENIED IN PART.  Summary judgment is GRANTED IN PART to Defendant on Plaintiffs' copyright claims (counts I–V) and trademark infringement claim (count X).  Summary judgment is DENIED IN PART in that the court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims (counts VI–IX, and XI).  These claims are DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Varsity's motion for summary judgment [Dkt. # 172] is DENIED.

A separate judgment will issue.

                                             s/Robert H. Cleland
                                             ROBERT H. CLELAND
                                             UNITED STATES DISTRICT JUDGE

Dated: March 1, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 1, 2014, by electronic and/or ordinary mail.

                                             s/Lisa Wagner
                                             Case Manager and Deputy Clerk
                                             (313) 234-5522